FILED

2025 Mar-07  PM 01:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **MADISON LOWRY** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )    **CASE NO:** |
| | ) |
| **BEST IN TOWN, INC. d/b/a** | ) |
| **THE FURNACE; and** | ) |
| **GRAHAM JACKSON** | ) |
| | ) |
| **Defendants.** | ) |

## COMPLAINT

Madison Lowry brings this action against Best in Town, Inc. d/b/a The Furnace ("The Furnace").

## I.    INTRODUCTION

Plaintiff was an exotic dancer at The Furnace, a night club featuring exotic dancing located at 309 28th Street N., Birmingham, Alabama 35203. This claim is brought under the Fair Labor Standards Act, 29 U.S.C. § 201, *et. seq.* (FLSA) for failure to pay minimum wages, and for illegally confiscating monies earned from the performance of exotic dances, however they are characterized. Plaintiff Madison Lowry also brings a claim for retaliatory discharge pursuant to 29 U.S.C. § 215.

Defendants willfully engaged in a pattern, policy and practice of unlawful conduct for the actions alleged in this Complaint. Defendant willfully failed to pay Plaintiff the minimum wages she was entitled to under applicable Federal laws. Additionally, Defendants unlawfully require dancers like Plaintiff to disgorge monies given to them by patrons, effectively forcing them to split them with non-tipped employees. Finally, Plaintiff was illegally terminated from her job as an

exotic dancer at The Furnace due to her prior participation in a Fair Labor Standards Act ("FLSA") claim against another club offering exotic dancing, and because she voiced her discontent about how the Furnace was going to change its practices in an attempt to keep the same business model, but avoid FLSA liability. This is a violation of the FLSA's retaliation provision at 29 U.S.C. § 215.

## II.    JURISDICTION AND VENUE

1.    This Court has subject-matter jurisdiction over Plaintiffs' FLSA claims pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a Federal question under 29 U.S.C. § 201, *et seq*.

2.    The Furnace's annual sales exceed $500,000, and it employs more than two persons in commerce, so the FLSA applies. 29 U.S.C. § 203(s)(1)(A)(i)-(ii). It also engages in interstate commerce as it is defined by the FLSA.

3.    Venue is proper in this District pursuant to 28 U.S.C § 1391 because the actions and omissions giving rise to the claims pled in this Complaint substantially occurred in this District.

## III.    THE PARTIES

4.    Madison Lowry is a resident of Jefferson County, Alabama, and is over the age of nineteen (19) years. Ms. Lowry worked as an exotic dancer at The Furnace from June of 2022 to November 29, 2024.

5.    Best in Town, Inc., d/b/a The Furnace is an Alabama corporation operating a nightclub in Birmingham, Alabama. This club features exotic dancing, and has operated since at least 2010.

6.    Graham Jackson is an individual, over the age of nineteen (19) residing in Jefferson County, Alabama, who directed, set, and enforced the terms and conditions of employment for exotic dancers at The Furnace.

## IV.    FACTUAL ALLEGATIONS

### A.  Facts Relating to The Gentlemen's Club.

7.    All relevant times, The Furnace has operated its location on 28th Street in Birmingham, Alabama since before 2010.

8.    The Furnace is managed by a management team headed by Graham Jackson and his brother, Gregory Jackson. Graham Jackson, at all times pertinent hereto, made and enforced policy as it related to exotic dancers at the location.

### B.  Facts Relating To Liability of Graham Jackson.

9.    Graham Jackson, at all times pertinent to the case, dominated the operation of The Furnace. Graham Jackson set and enforced all policies with regard to the terms and conditions of employment for exotic dancers.

10.    Graham Jackson set each policy related below regarding work hours, tip outs, or stage fees payment for private dances, and any other requirements of exotic dancers at The Furnace.

11.    Graham Jackson has been at all times relevant to this action in a position to control the work activities of Plaintiff and the other exotic dancers at The Furnace. Graham Jackson at all times had the power to, and did on occasion, hire and fire exotic dancers at The Furnace. Graham Jackson, at all pertinent times, made the management decisions regarding exotic dancers in implementing and enforcing the hours, work schedules, and working conditions of the exotic dancers outlined herein.

12.    Graham Jackson determined how exotic dancers such as Plaintiff would be paid, and how monies paid to the Club and dance fees would be split and accounted for. Finally, Graham Jackson maintained what employment records were kept at The Furnace.

13.    In short, Graham Jackson directed all of the terms and conditions of Plaintiff's employment.

**C.    Facts Relating to Ms. Lowry's Claim for Unpaid Wages and Confiscated Monies Pursuant to the FLSA.**

      **1.    Facts Relating To Working Conditions For Exotic Dancers at The Furnace.**

14.    Plaintiff has been intentionally misclassified by The Furnace as an independent contractor.

15.    Plaintiff has not been paid a minimum wage by The Furnace. In fact, Plaintiff was not paid any hourly wages by Defendants.  All monies paid to the dancers come directly from the patrons at the Club, as described herein.

16.    No exception to the FLSA applies.

17.    At all relevant times, Defendant directly and indirectly exercised significant control over the wages, hours, and working conditions of Plaintiff.

18.    Plaintiff has incurred financial loss, injury and damage as a result of the business practices of Defendants in misclassifying exotic dancers as independent contractors and failing to pay a minimum wage.

19.    Plaintiff generated her income solely through the monies received from customers for the performance of exotic dances.

20.    All monies that Plaintiff received from customers in the performance of exotic dances were, as described below, either tips or service fees.  In either case, as described below, Defendants had no right to keep any portion of the monies paid.  These payments were given by

patrons solely for services performed by Plaintiff and therefore, if considered tips, belong to Plaintiff, not Defendants.

21.     Alternatively, the payments Plaintiffs received from patrons in relation to exotic dances were service charges not taken into Defendants' gross receipts, and then paid out to Plaintiff.

22.     Plaintiff may have been considered a tipped employee, as she was engaged in an occupation in which they customarily and regularly receive more than $30 a month in tips, if dance fees are considered tips.  No tip credits offsetting any minimum wages due, however, are permitted. Therefore, Plaintiff is entitled to: (i) minimum wages for all work performed; and (ii) the full amount of any monies given to her by customers for the performance of exotic dances.

23.     Defendants' misclassification of Plaintiff was specifically designed to deny Plaintiff's fundamental right as an employee to receive minimum wages; to illegally demand and retain portions of tips and fees paid by customers; and to enhance Defendants' profit margin at the expense of the dancers.

24.     The misclassification of Plaintiff by Defendants was willful.

25.     Defendants knew or should have known that Plaintiff was improperly misclassified as an independent contractor.

26.     The determining factor as to whether a worker is an employee or independent contractor under the FLSA is not the worker's or employee's election, subjective intent, or any contract.  Rutherford Food Corp. v. McComb, 331 U.S. 722, 727 (1947).  Rather, the test for determining whether an individual is an "employee" under the FLSA is the economic reality test. Under the economic reality test, employee status turns on whether the individual is, as a matter of economic reality, in business for themselves and truly independent, or rather is economically

dependent upon finding employment in others.  In this case, Plaintiff was dependent upon The Furnace to earn a living.

27.    Under the applicable test, courts utilize several factors to determine economic dependence and employment status. They are: (i) the degree of control exercised by the alleged employer, (ii) the relative investments of the alleged employer and employee, (iii) the degree to which the employee's opportunity for profit and loss is determined by the employer, (iv) the skill and initiative required in performing the job, (v) the permanency of the relationship, and (vi) the degree to which the alleged employee's tasks are integral to the employer's business.

28.    The totality of circumstances surrounding the employment relationship between Defendants and Plaintiff establishes economic dependence by Plaintiff on Defendants.  Here, Plaintiff was not in business for herself and truly independent; but rather was economically dependent upon her employment with Defendants. Plaintiff did not engage in an occupation or business distinct from that of Defendants. To the contrary, Plaintiff was the basis for the business of The Furnace. Without exotic dancers, The Furnace could not exist as "Gentlemen's Club."

29.    The Furnace obtains the customers who seek out exotic dance entertainment and provides the workers who conduct the exotic dance services. Defendants retain pervasive control over the Club's operations as a whole, and Plaintiff's and the other dancers' duties are an integral part of those operations.

## 2. <u>Degree of Control Exercised by Defendants.</u>

30.    Plaintiff did not exert control over any meaningful part of business operations, and did not stand as a separate economic entity from The Furnace. Defendants exercise control over all aspects of the working relationship with Plaintiff and the other dancers at The Furnace. Indeed, Defendants required Plaintiffs to dance under stage names.

31.     Plaintiff's economic status was inextricably linked to conditions over which The Furnace and Mr. Jackson have complete control, including but not limited to, advertising and promotion; the atmosphere and surroundings at the Club; the flow of customers into the Club; and the customer volume.

32.     The Furnace employed guidelines and rules dictating the way in which Plaintiff and the other dancers had to conduct themselves while working.  These guidelines include, but are not limited to:

      a.      The Furnace set hours, which were the only hours the dancers could work, from 4:00 p.m. to 2:00 a.m. on weeknights; and from 4:00 p.m. to 4 a.m. on weekends;

      b.      The Furnace controls who enters the Club;

      c.      The dancers must pass visual inspections by the "house mom" before and during every shift;

      d.      The dancers must stay on the stage until the next dancer arrives on stage when it is her turn to be on stage;

      e.      Each dancer must sign a document agreeing that they will work a minimum of four nights per week;

      f.      The dancers must be scheduled to work, and would be called into work if the Club did not have enough dancers scheduled for a particular night;

      g.      When customers want a private dance, The Furnace requires that they pay $20 per dance to the dancer.

      h.      The Furnace set the price for V.I.P rooms for dancers, mandating that for each 15 minute increment, the customer pay $150.00, of which $50.00 goes to the Club, and $100.00 goes to the dancer.

33.     Defendants' control the conduct of dancers while at work, in a manner which supports Defendants' general business plan, but does not benefit the dancers, is indicia that the dancers were employees, not independent contractors.

34.     Defendants require dancers to literally pay management a fee to work as an exotic dancer at The Furnace.  As stated above, the dancers paid at least $45.00, plus $10.00 to the disc jockey, every shift.

35.     Dancers were required to be scheduled for, and to work, their shifts. If they did not work the required shifts as scheduled, they would be fined, and they had to pay the fine before they could work again, or have it taken out of dance fees earned while they were working, or not be allowed to work.

**3.    Facts Negating Skill and Initiative of a Person in Business For Themselves.**

36.     Plaintiff did not exercise the skill and initiative of a person in business for herself.

37.     Plaintiff was not required to have any specialized or unusual skills to work, and the skills utilized in performing exotic dances are commensurate with those exercised by ordinary people.

38.     Plaintiff did not have the opportunity to exercise the business skills and initiative necessary to elevate their status to that of independent contractors as they owned no enterprise, nor did they maintain separate business structures or facilities. The dancers' ability to earn income is directly tied to The Furnace, not their own initiative.

39.     Plaintiff had no control over customers, nor did they actively participate in any efforts to increase the client base, profit, or to improve business in any capacity at The Furnace. They do not even control the hours they could perform.

40.     A dancer's own initiative is limited to wardrobe, which is itself subject to final approval by Defendants, and how provocatively to dance, actions which are consistent with the status of an employee as opposed to an independent contractor.

41.     Plaintiff was not permitted to hire or subcontract other qualified individuals to provide additional dances to patrons, and increase their revenue, as an independent contractor in business for themselves would have the authority to do.

**4.    Facts Establishing Relative Investment.**

42.     Dancers like Ms. Lowry's relative investment is minor when compared to the investment made by The Furnace.

43.     Dancers like Ms. Lowry make no financial investment in facilities, advertising, maintenance, sound system and lights, food, beverage, and other inventory.  All capital investment and risk belongs to Defendants.

44.     The dancers' investment is limited to expenditures on wardrobe and make-up. Absent Defendants' investment and provision of the club work environment, the dancers could not earn any money.

**5.   <u>Facts Establishing Opportunity for Profit and Loss</u>.**

45.     Defendants manage all aspects of the business operation, including but not limited to attracting investors, maintaining the premises, establishing the hours of operation, setting the atmosphere, coordinating advertising, hiring and controlling the staff.  Defendants provide all necessary capital to open and operate the business.

46.     Plaintiffs have no responsibility for any aspect of The Furnace's ongoing business risk.  Defendants secure all financing, the acquisition and/or lease of the physical facility and equipment, inventory, the payment of wages (for managers, bartenders, doormen, and waitresses). The Furnace alone is responsible for securing all necessary and appropriate insurance and licenses. Defendants set the minimum dance fees  and establish the fee splitting policy for dances performed in the VIP rooms.

**6.   <u>Facts Establishing Permanency</u>.**

47.     Ms. Lowry worked fairly regularly at The Furnace, as alleged above. Plaintiff worked the mandatory four (4) shifts per week.

48.     While Ms. Lowry and the dancers may not work at The Furnace at length, Courts have generally placed little emphasis on this factor in exotic dancer cases. <u>Scantland v. Jeffry Knight, Inc.</u>, 721 F.3d 1308, 1312 (11th Cir. 2013).

**7.    <u>Facts Establishing Plaintiffs are Integral Part of Employer's Business</u>.**

49.     Exotic dancers are critical to the success of The Furnace and The Furnace's very operation is wholly dependent on the existence of exotic dances being provided by dancers for patrons.

50.     The primary "product" or "good" The Furnace is in business to sell consists of dances performed by the exotic dancers.  Other goods sold by Defendants include drinks and food, which are served to patrons by waitresses and bartenders, but without the exotic dancers, The Furnace has no business.

**8.    <u>Facts Establishing that Defendants' Acts Were Willful</u>.**

51.     All of the actions described herein were willful, intentional and not the result of mistake or inadvertence.

52.     Defendants are and have been aware, or should be aware, that the FLSA applies to its business at all relevant times and that under the economic realities test applicable to determining employment status under those laws the dancers were misclassified as independent contractors.

53.     In fact, Defendants were sued for these same FMLA violations in a collective action in 2021. It ultimately settled that case.

54.     Exotic dancers working under conditions similar to those employed at The Furnace have been determined to be employees under the wage and hour laws, not independent contractors.

55.     Despite this notice of their violations, Defendants intentionally choose to continue to misclassify dancers like Plaintiffs, withhold payment of minimum wages, and require dancers

to split their tips in an effort to enhance their profits. Such conduct and agreements were intentional, unlawful, fraudulent, deceptive, unfair and contrary to public policy.

56.     Plaintiff was never paid an hourly wage, at all, by Defendants.

57.     Plaintiff had to pay Defendants according to the schedule referenced above for private dances. Plaintiff continued to have to pay every time they worked.

58.     Plaintiff had to pay $10.00 for the jukebox for each shift.

59.     Plaintiff was required to work four (4) per week, or pay a fine or risk being fired.

**D.  Facts Relating to Ms. Lowry's Claim for Retaliatory Discharge.**

60.     Prior to working at The Furnace, Ms. Lowry worked for other exotic dance clubs in Alabama. In particular, Ms. Lowry worked as an exotic dancer at the Pony Bama Club in Madison, Alabama, where she worked from 2016 to May of 2020.

61.     In May of 2020, Ms. Lowry filed a FLSA case against the Pony Bama, Case No. 5:20-CV-01828, in the United States District Court for the Northern District of Alabama. This case was very similar to this case, and related to a workplace similar to The Furnace in function as it featured exotic dancers.

62.     That case was settled in June 2023, so there was some overlap between when Ms. Lowry began working for The Furnace in June of 2022, and the Pony Bama litigation.

63.     At this same time, The Furnace was involved in its own FFLSA litigation over the virtually identical issues raised in this case. That case was styled Manasco v. Best in Town, Inc., Case No. 2:21-CV-00381-JHE, in the United States District Court for the Northern District of Alabama ("Manasco"), filed in March of 2021.

64.    The <u>Manasco</u> case, was brought as a collective action under 29 U.S.C. § 216(b). The Court granted the plaintiffs' Motion for Conditional Certification, and notice went out to class members, many of whom opted into the litigation.

65.    The <u>Manasco</u> Court granted the plaintiffs' Motion for Summary Judgment on liability in the case finding that, as a matter of law, The Furnace had violated the FLSA in the way it classified the exotic dancers.

66.    The parties then settled the case in January of 2024, and the settlement was approved in February of 2024.

67.    The litigation and settlement of the claims was, of course, discussed widely by dancers and management within the Club, with many competing versions of the facts, and questions as to whether other dancers would bring claims.

68.    In November of 2024, management at The Furnace called an all-staff (including dancers) mandatory meeting for Sunday, November 24, 2024.

69.    The primary purpose for this meeting was to discuss the settlement of the case against The Furnace, and to explain to the dancers a modified way that they would get paid, going forward, based upon having been sued, and settling, a case under the FLSA.

70.    Graham Jackson led the meeting and instantly began complaining about FLSA suits against clubs brought by exotic dancers. He sought, in his speech, to convince the dancers that cases such as these were not worth the dancers' time, and would result in dancers not being able to continue to work in the business.

71.    Another reason that Graham Jackson decided to have this meeting at this time was that there were several dancers, including Ms. Lowry, who had been plaintiffs in FLSA cases

against other clubs, and Graham Jackson began to hear rumors that there was going to be another lawsuit based on the FLSA against The Furnace.

72.     Despite settling a FLSA case against it brought by exotic dancers, The Furnace has not changed the working conditions or rules for exotic dancers in any meaningful way.

73.     During the meeting, Graham Jackson specifically stated that he knew there were dancers in the room who had been in FLSA cases before, and he urged the dancers to "do the right thing" regarding participation in cases against The Furnace.

74.     Shortly after the meeting, Ms. Lowry posted on her private (meaning only those whom she had given access to could view it) Instagram story a video of herself stating that The Furnace was going to lose a lot of dancers due to how they were handling the situation.

75.     While the Instagram story was private, many Furnace dancers had access to it. Eventually, Mr. Graham Jackson saw the video.

76.     Mr. Graham Jackson's response to having seen the video was to fire Ms. Lowry for her voicing her displeasure with how The Furnace had handled FLSA cases, and because she had already been a part of an FLSA case against an exotic dance club.

77.     When Ms. Lowry asked why she was being fired, she was only told that Graham Jackson understood she was unhappy, and that he did not want someone who was unhappy working there. Later, when asked again why Ms. Lowry was fired, Mr. Graham Jackson stated that it "just wasn't working out." He made this statement even though Ms. Lowry had been working there for over two years without any incidents or complaints, and she had made a lot of money for The Club.

78.     Mr. Graham Jackson also fired at least one other employee that had previously been involved in a FLSA case against a club featuring exotic dancing.

79.     Lest there be any question that Ms. Lowry was singled out for her earlier participation in a FLSA case, and for voicing her opinion regarding The Furnace's proposed changes, during the meeting one of the managers, when stating that "there are girls in here who are in the lawsuits, or have been in a lawsuit, or are planning one" looked directly at Ms. Lowry, making eye contact, and making it clear that she was talking about Ms. Lowry.

## V.     INJURY AND DAMAGE RELATIVE TO THE UNDERLYING FLSA VIOLAITONS

80.     Plaintiff was harmed, and incurred damage and financial loss as a result of The Furnace's conduct complained of herein regarding its pay practices.

81.     Plaintiff was entitled to minimum wages, and to retain all of the private dance tips and other tips given by patrons. By failing to pay Plaintiff minimum wage and interfering with her right to retain all of the dance fees, Defendants injured Plaintiff, causing her financial loss, harm, injury and damage.

## VI.     INJURY AND DAMAGE RELATING TO PLAINTIFF'S RETALITORY DISCHARGE

82.     Not only did Ms. Lowry not get paid as she should have as an employee while she worked at The Furnace, but she was fired because The Furnace knew that she filed a FLSA case before, and she voiced her displeasure at The Furnace's attempts to skirt its FLSA obligations.

83.     As a result, Ms. Lowry have lost her job because she had already filed a FLSA case, and then made vocal her opposition to The Furnace's proposed practices.

## VII.     CAUSES OF ACTION

### COUNT I - VIOLATION OF THE FLSA
### (Failure to Pay Statutory Minimum Wages Against All Defendants)

84.     Plaintiff hereby incorporates all of the preceding paragraphs as if fully stated herein.

85.     Graham Jackson, as described above, because of the control he exercised over the dancers, is an "employer" as that term is defined by 29 U.S.C. § 203(d), and is thus individually liable. Each claim under this Court is made against Mr. Jackson, individually, as well as against The Furnace.

86.     This claim arises out of Defendants' willful violation of the Fair Labor Standards Acts, 29 U.S.C. Sec. 201, et seq., for failure to pay a minimum wage to Plaintiff to which they were entitled.

87.     At all relevant times, The Furnace employed Plaintiff within the meaning of the FLSA.

88.     At all relevant times, The Furnace was an enterprise whose annual business income was in excess of $500,000, pursuant to 29 U.S.C. § 203(5)(1)(A)(ii). Defendants are also engaging in interstate commerce, as that term is defined by the FLSA, through the use of the interstate wires for its music. The Furnace downloads all of its music from a streaming service that uses the interstate wires.

89.     The minimum wage provisions of the FLSA, 29 U.S.C. 201 et seq., apply to The Furnace to protect Plaintiff.

90.     Pursuant to 29 U.S.C. § 206, Plaintiff were entitled to be compensated at the rate of $7.25 per hour.

91.     29 U.S.C. § 207(a) provides in pertinent part:

> ... no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate of not less than one and one-half times the regular rate at which he is employed.

92.     Defendants failed to pay Plaintiff the minimum wage set forth in 29 U.S.C. § 206, or any wages whatsoever.

93.     The amount paid to Plaintiff by patrons in relation to private dances and V.I.P. room performances were either service fees or tips, not wages.  In either case, they were improperly kept by Defendants.

94.     The private dance fees are paid directly to the dancers by customers, not to the Defendants. Thus, they cannot be wages.

95.     Courts have classified private dance fees paid by customers of exotic dance clubs as either tips or service fees.  In either case, Defendants cannot confiscate the private dance fees and they are due to be returned to Plaintiffs.  If the private dance fees are considered tips, then The Furnace has no right to them because under the FLSA an employer may not keep any portion of employees' tips . . ." 29 U.S.C. § 203(m)(2)(B).

96.     It could be argued that the private dance fees are service fees paid to the establishment.  However, in such a case, Defendants still would not be able to retain them, nor would they be able to claim such confiscated private dance fees as a credit against their minimum wage obligation.

97.     In order to take the private dance fees as a credit, Defendants would have to actually pay the dancers, and then it would have to have included the private dance fees in the gross revenues of the company, and then pay them out to the dancers. This was not done.

98.     As a result, under any circumstance, the amounts paid to Plaintiffs and the Class by patrons in relation to private table dances cannot be used to offset The Furnace's obligation to pay the Plaintiffs minimum wages due.  See Hart v. Rick's Cabaret, Int'l, 2013 U.S. Dist. Lexis 129130 (S.D.N.Y. Sept. 10, 2013) e.g., Reich v. ABC/York-Estes Corp., 157 F.R.D. 668, 680 (N.D. Ill.

1994), rev'd on other grounds, 64 F.3d 316 (7th Cir. 1995); <u>Reich v. ABC/York-Estes Corp.</u>, 1997 WL 264379 at *5-7 (N.D. Ill. 1997).

99.   Further, no tip credit applies to reduce or offset any minimum wages due.  The FLSA only permits an employer to allocate an employee's tips to satisfy a portion of the statutory minimum wage requirement provided that the following conditions are satisfied: (1) the employer must inform the tipped employees of the provisions of § 3(m) of the FLSA, 29 U.S.C. § 203(m); and (2) tipped employees must retain *all the tips* received except those tips included in a tipping pool among employees who customarily receive tips.  29 U.S.C. § 203(m).

100.   Neither of these conditions was satisfied.  Defendants did not inform Plaintiff of the provision of § 3(m) of the FLSA, 29 U.S.C. § 203(m), and Plaintiffs did not retain all the tips received.

101.   The Furnace did not notify Plaintiff or the other dancers that their dance fees were being used to reduce the minimum wages otherwise due under FLSA's tip credit provisions, and that they were still due the reduced minimum wage for tipped employees because Defendants maintained as a business strategy that Plaintiff and the other dancers were not due a minimum wage due to their classification as independent contractors.

102.   The Furnace's requirement that Plaintiff and the other dancers pay Defendants a portion of dance fees for V.I.P. dances, and to pay a "tip-out" to other employees who do not customarily receive tips, such as bouncers and managers, was not part of a legally permissible or valid tip pooling or tip sharing arrangement.

103.   Based on the foregoing, Plaintiff is entitled to the full statutory minimum wages set forth in 29 U.S.C. §§ 206 and 207 for all periods in which Plaintiff worked for Defendants, along with all applicable penalties, liquidated damages, and other relief.

104.    Defendants' conduct in misclassifying Plaintiff as an independent contractor was intentional and willful and done to avoid paying minimum wages and the other benefits that Plaintiffs and the Class were legally entitled to receive.

105.    Plaintiff seeks damages in the amount of her unpaid wages, liquidated damages as provided by 29 U.S.C. § 216(b), interest, and such other legal and equitable relief as the Court deems proper.

106.    12 U.S.C. § 211(c) provides in pertinent part:

(c)    Records

Every employer subject to any provision of this chapter or of any order issued under this chapter shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of this chapter or the regulations or orders thereunder.

107.    The Regulations, 29 C.F.R. § 516.2 and 29 C.F.R. § 825.500, further require that every employer shall maintain and preserve payroll or other records containing, without limitation, the total hours worked by each employee each workday and total hours worked by each employee each workweek.

108.    To the extent The Furnace failed to maintain all records required by the aforementioned statutes and regulations and failed to furnish Plaintiff comprehensive statements showing the hours that they worked during the relevant time period, it also violated the aforementioned laws causing Plaintiffs' damages.

18

109.   When the employer fails to keep accurate records of the hours worked by its employees, the rule in <u>Anderson v. Mt. Clemens Pottery Co.</u>, 328 U.S. 680, 687-688 (1946) is controlling.  That rule states:

> ...where the employer's records are inaccurate or inadequate ... an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.  The burden then shifts to the employer to come forward with the evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.  If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

110.   The Supreme Court set forth this test to avoid placing a premium on an employer's failure to keep proper records in conformity with its statutory duty, thereby allowing the employer to reap the benefits of the employees' labors without proper compensation as required by the FLSA. Where damages are awarded pursuant to this test, "[t]he employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with ... the Act." <u>Id</u>.

111.   Based on the foregoing, Plaintiff seeks unpaid minimum wages at the required legal rate for all working hours during the relevant time period, back pay, restitution, damages, reimbursement of any base rent and tip-splits, liquidated damages, prejudgment interest calculated at the highest legal rate, attorneys' fees and costs, and all other costs, penalties and other relief allowed by law.

## COUNT II – RETALITATION
### (Claims for Retaliatory Discharge Under 29 U.S.C. § 215(b))

112.   Plaintiff incorporated by reference, as if set forth fully herein, paragraphs 1-111 above.

113.    Madison Lowry was discharged because: (a) The Furnace management knew she has been a plaintiff in a FLSA case against an exotic dancing club; and (b) had a meeting specifically meant to discourage dancers from taking advantage of their FLSA rights; and then (c) when Ms. Lowry complained about the way that The Furnace was going to the change its business model as it related to the dancers, The Furnace chose to fire her for fear that she would institute another case against the Club.

114.    The discharge of Ms. Lowry falls under 29 U.S.C. § 215(a)(3), making it unlawful to discharge or otherwise discriminate against an employee because such an employee filed a complaint or instituted a proceeding related to the FLSA.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff, prays for an order for relief as follows:

a.    That Defendants be found liable to Plaintiff for the underlying violations articulated in Count I above, and for retaliation under Count II above;

b.    Reinstatement;

c.    Nominal damages;

d.    Compensatory and actual damages;

e.    For restitution of all monies due Plaintiffs and disgorged profits from the unlawful business practices of Defendants;

f.    For all back pay, unpaid wages, and a refund of all tips, "rent," tip-outs, fines and other amounts paid by Plaintiffs;

g.    For all statutory damages, liquidated damages, civil penalties, and/or other relief allowed by federal wage and hour statutes and regulations and/or other laws, including front pay for retaliatory discharge

h.    For accrued interest;

i.    For costs of suit and expenses incurred herein, including reasonable attorneys' fees allowed under any relevant provision of law or equity, including the FLSA; and

j.   For any and all other relief that the Court may deem just, proper and equitable in the circumstances.

## PLAINTIFFS DEMAND TRIAL BY STRUCK JURY

Respectfully submitted,


/s/ Brian M. Clark
Brian Clark
Attorney for Plaintiffs


## PLEASE SERVE DEFENDANTS AT THE FOLLOWING ADDRESSES:

The Furnace
309 28th Street N.
Birmingham, Alabama 35203

Graham Jackson
309 28th Street N.
Birmingham, Alabama 35203